UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Kristen Faus, on behalf of her minor daughter E.F., Betsy Eiss, on behalf of her minor daughter J.E., and all others similarly situated;<br><br><br>                         Plaintiffs,<br><br>-against-<br><br>Indian River Central School District; Indian River Central School District Board of Education; Troy Decker; Angela Green; Meghan Caddick;<br><br><br>                         Defendants. | No.  5:25-cv-453 (DNH/ML)<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs Kristen Faus and Betsy Eiss, by and through their attorneys Kaufman Lieb Lebowitz & Frick, allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this lawsuit to stop Indian River Central School District ("IRCSD") from illegally giving failing grades to middle school students who cannot participate in swim class while menstruating.

2.      Students at Indian River Middle School ("IRMS") have mandatory swim classes as part of their physical education instruction. When students are menstruating during swim class and are uncomfortable using a period product that allows them to enter the water, they sit on a bench next to the pool, watch their peers swim, and receive a zero grade for the day.

3.      No alternative activity is provided, nor are they excused. They are failed because they have their period.

4.      The discrimination that these students face regularly at IRMS fills them with shame and humiliation, since they are stigmatized for having their period.

5.      Period stigma is faced by people of all ages, but the shame associated with having a period is particularly sharp for preteens and teens: 75% of teens say there is a "negative association" with periods. This is particularly true at school—63% of teens say the school environment makes them especially self-conscious of their periods, and 57% of teens are not comfortable talking about their periods at school. Younger teens—such as those in middle school—are more likely to express discomfort around their period.[1]

6.      In addition, giving these students failing grades for having their periods deprives them of educational opportunities, including by lowering their grade point average, which can affect applications to high school and eligibility for sports teams and other activities.

7.      This harmful, discriminatory practice must stop. Not only does it violate state and federal law, but it fosters long-term shame and stigma by chastising and penalizing students for a normal bodily function. This action seeks to hold IRCSD accountable for the impact the practice has had on students and prevent it from generating shame in future IRMS students.

## PARTIES

8.      E.F. is a 12-year-old girl and appears in this action by and through her mother, Kristen Faus. At all relevant times, E.F. has attended IRMS.

9.      J.E. is a 12-year-old girl and appears in this action by and through her mother, Betsy Eiss. At all relevant times, J.E. has attended IRMS.

---

[1] *State of the Period 2023,* PERIOD., https://period.org/uploads/2023-State-of-the-Period-Study.pdf (last visited Apr. 10, 2025).

10.     Defendant Indian River Central School District ("IRCSD" or the "District") is a public school district in New York State. IRMS is a school in the District.

11.     Defendant Indian River Central School District Board of Education (the "Board") is a public education corporation governing IRCSD pursuant to the laws of New York State.

12.     Defendant Troy Decker, sued in both his official and individual capacities, is the current superintendent of IRCSD. Mr. Decker is an employee of IRCSD. As superintendent, Mr. Decker has the ability and authority on behalf of IRCSD to stop discrimination at IRMS.

13.     Defendant Angela Green, sued in both her official and individual capacities, is the current principal of IRMS. Ms. Green is an employee of IRCSD. As principal, Ms. Green has the ability and authority on behalf of IRCSD to stop discrimination at IRMS.

14.     Defendant Meghan Caddick, sued in her individual capacity, is currently an assistant principal at IRMS. Ms. Caddick is an employee of IRCSD. As assistant principal, Ms. Caddick has the ability and authority on behalf of IRCSD to stop discrimination at IRMS.[2]

---

[2] Plaintiffs served Defendants with a notice of claim pursuant to N.Y. Educ. Law § 3813 and Defendants have requested 50-h hearings which are being scheduled for May. However, since Plaintiffs bring this case on behalf of a class of students and have demonstrated that they are pursuing this claim in the public interest they can proceed without satisfying the notice of claim requirement. *See Pratt v. Indian River Cent. Sch. Dist.,* 803 F. Supp. 2d 135, 148 (N.D.N.Y. 2011).

**JURISDICTION AND VENUE**

15.    The Court has subject-matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343(a)(4). The Court has supplemental jurisdiction over Plaintiffs' state law claims under and 28 U.S.C. § 1367(a).

16.    The acts complained of occurred in the Northern District of New York, and venue in this Court is proper under 28 U.S.C. § 1391(b).

**JURY DEMAND**

17.    Plaintiffs demand a trial by jury in this action.

**FACTUAL ALLEGATIONS**

**Indian River Central School District**

18.    IRCSD covers 285 square miles and enrolls approximately 3,300 students. Its operating budget is about $102 million.[3]

19.    Fifty-two percent of students who attend IRCSD have a parent in the armed forces, as the District includes Fort Drum. Fort Drum is home to nearly 20,000 soldiers and the most deployed unit in the U.S. Army. Many parents of IRCSD students are deployed.

20.    There are eight schools in the District. IRMS is the only middle school, serving students in the sixth through eighth grade, who are typically 11 to 14 years old.

---

[3] Indian River Central School District Data (2023-2024), NEW YORK STATE EDUCATION DEPARTMENT, https://data.nysed.gov/enrollment.php?year=2024&inst id=800000051235 (last visited Apr. 10, 2025).

21.     For the 2023-2024 academic year, there were 269 students in the sixth grade, 221 students in the seventh grade, and 220 students in the eighth grade. 357 of these students identify as male and 353 identify as female.[4]

**IRMS's Physical Education Requirement**

22.     IRMS has a physical education ("PE") requirement for all students. Students must take and pass PE to graduate.

23.     The District's PE Plan dictates what happens when students are unable to participate in PE. It says that "[t]hose students unable to participate in the regular program may receive alternate forms of physical education." It further clarifies that "[s]tudents who are *temporarily* unable to participate in the regular program of Physical Education will remain in their scheduled physical education class. The instructor will provide an alternative, temporary, program within the guidelines established by the physician."[5]

24.     For example, if a student has a broken wrist and is not able to participate in their PE class, they are permitted to do an alternative activity such as walking and/or writing a paper. They do not a receive a zero for being unable to participate.

25.     PE is a graded class, and a student's PE grade is included in the calculation of their grade point average. It is also listed on the student's transcript. If a student does not get a high grade in PE, they may be precluded from achieving honor roll,

---

[4] Indian River Middle School Data (2023-2024), NEW YORK STATE EDUCATION DEPARTMENT, https://data.nysed.gov/enrollment.php?year=2024&instid=800000 051244 (last visited Apr. 10, 2025).

[5] *Physical Education Plan*, INDIAN RIVER CENTRAL SCHOOL DISTRICT (Mar. 21, 2013), https://sites.google.com/ircsd.org/athletics/athletics-information/physical-education-plan.

participating in sports, and/or obtaining other educational opportunities related to their grade point average.

**Swimming at IRMS**

26.    IRMS is home to the Indian River Pool, an Olympic-sized swimming pool. It is the only school in the District with a pool.

27.    The pool is a point of pride for IRCSD. As the District's website explains, "The athletic facilities are second to none in the region. Our gymnasium is the largest and most modern in any school in northern New York State and [the] Middle School also houses an Olympic size swimming pool. The outdoor physical education and recreational facilities are a matter of District and community pride."[6]

28.    As part of IRMS PE, students are required to complete multiple swim units each year. Students in elementary and high school do not have this requirement.

29.    During swim units, students are required to swim for two to three days per week for three consecutive weeks. They have this unit three to four times per year. This amounts to a total of 18-36 days of swimming per year.

30.    IRMS students who are in school but do not participate in swimming receive a 0/5 grade for each missed class, regardless of the reason they do not participate.

31.    As the school explains to parents at the start of the year: "A student who participates in the daily lesson will receive 5 points for that class. If any student misses a lesson for any reason they will be asked to make up the lesson during the designated make up time. Students who are in school but cannot swim for any reason will have the

---

[6] *About Us*, INDIAN RIVER MIDDLE SCHOOL, https://www.irms.ircsd.org/en-US/about-us-f0c636ad (last visited Apr. 10, 2025).

choice to either sign out and go to a designated study hall or sit on the pool deck and watch the day's lesson. All students who miss a lesson will receive '0' for a grade until the lesson is made up."

32.     While in theory, students who cannot swim are to be provided access to a study hall as an alternative, in practice, they simply watch their peers swim. No alternative PE activity is offered.

33.     Notwithstanding the school's assertion that a student who misses swim class "for any reason" will receive a zero until they complete a make-up the class, in practice, the policy applies chiefly to students who miss swim due to menstruation.

34.     If a student is injured such that they cannot go in the pool—such as if a student has recently received staples on a wound that cannot get wet or has a broken wrist—they are not given a zero or told to make up swim class. In fact, students who have injuries that last the entire quarter and prevent them from swimming for entire units are able to receive a 100% for the quarter.

35.     This is reflected in the student's gradebook, which indicates that the student does not receive a zero but is excused—either marked as "MD" or "AB":

| Course | Category | Assignment Name / Description | Date | Max | Score |
|--------|----------|-------------------------------|------|-----|-------|
| PE 6-8 (Murtha) | Psychomotor | POOL | 1/22/2024 | 5 | [MD] |
| PE 6-8 (Murtha) | Psychomotor | PE | 1/12/2024 | 5 | [MD] |
| PE 6-8 (Murtha) | Psychomotor | PE | 1/8/2024 | 5 | [MD] |
| PE 6-8 (Murtha) | Psychomotor | PE | 1/4/2024 | 5 | [MD] |
| PE 6-8 (Murtha) | Psychomotor | PE | 12/19/2023 | 5 | [MD] |
| PE 6-8 (Murtha) | Psychomotor | PE | 12/15/2023 | 5 | [AB] |
| PE 6-8 (Murtha) | Psychomotor | PE | 12/13/2023 | 5 | [MD] |
| PE 6-8 (Murtha) | Psychomotor | PE | 12/11/2023 | 5 | [AB] |
| PE 6-8 (Murtha) | Psychomotor | POOL | 12/7/2023 | 5 | [AB] |
| PE 6-8 (Murtha) | Psychomotor | POOL | 12/5/2023 | 5 | [MD] |
| PE 6-8 (Murtha) | Psychomotor | POOL | 12/1/2023 | 5 | 5 |
| PE 6-8 (Murtha) | Psychomotor | POOL | 11/27/2023 | 5 | [AB] |

36.    All IRMS students are given one "free pass" per swimming unit. This means that they can skip swimming once for any reason and their 0/5 grade will be waived.

37.    After the "free pass" is used, students theoretically have the opportunity to make up the credit for any other days they did not swim due to menstruation and received a 0/5. In practice, however, many students are unable to make up these credits.

38.    To make up a missed swimming class, a student has two options.

39.    The first option is that the student can schedule a make-up class during study hall. This is only possible if the student has a study hall as part of their schedule. Many students do not have a study hall period and for those that do, study hall is a time they need to use for their schoolwork.

40.    Study hall make-ups must be scheduled by the student. The student must send a note via their online portal to their PE teacher, who must approve the request. The requests often are not reviewed in time and thus become moot. If the request is approved, the student must, at the beginning of the class, inform their study hall teacher that they are going to a swim make-up session.

41.    Swimming during study hall is incredibly stressful for the students. Due to the fact that they have to check in to study hall, there is not enough time to change and swim. Students are often late to their next class.

42.    The second option to make up a swim class is that the student can attend a prescheduled make-up class after school. If the student's make-up is after school, they must miss other scheduled activities, including sports practices or afterschool clubs.

43.    They are also not able to take the bus home from school at the regular time and either have to be picked up or wait for a late bus, which may or may not be available

8

to them. The school prefers that they be picked up immediately after the make up and before the late bus.

44.     The late bus includes students in grades 6-12, as opposed to the regular bus which is just for middle school. The late bus also serves students in a wider geographic area and takes longer than the regular bus. For some students, the late bus can take more than an hour to drop them off at home.

45.     Both study hall and afterschool make-up classes must be completed close to the student's swimming unit.

46.     Needless to say, if a student is menstruating during their swim unit, they may also be menstruating during make-up class opportunities.

47.     For all of these reasons, it is often difficult or impractical for many students to make up lost swim credits.

**<u>Swimming While Menstruating</u>**

48.     Menstruation is when blood and tissue from the uterine lining is shed and leaves the body through the vagina. The average length of a period is five days, although it can be as long as seven. The average number of days between the start of each period is 28.[7]

49.     In 2024, the average age at menarche, the first menstrual period, was 11.9 years old.[8] It is therefore not surprising that many IRMS students have recently begun menstruating and/or will get their period while they are a student at IRMS.

---

[7] *Menstrual Cycle: What's Normal, What's Not,* MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH (Oct. 19, 2022), https://www.mayoclinic.org/healthy-lifestyle/womens-health/in-depth/menstrual-cycle/art-20047186.

[8] Want et. al., *Menarche and time to cycle regularity among females born between 1950-2005 in the US,*  JAMA NETWORK OPEN (May 29, 2024), doi: 10.1001/jamanetworkopen.2024.12854.

50.     Notably, the onset of menstruation coincides with a particularly difficult social period. Between the ages of 8 and 14, girls' confidence levels fall by 30 percent.[9]

51.     There are many products people can use to collect blood during menstruation, including sanitary pads, tampons, menstrual cups, menstrual discs, and period underwear. Many younger people choose to use sanitary pads, particularly when they first start menstruating, as they either cannot insert or are uncomfortable inserting products into their vagina.

52.     In order to hygienically swim while menstruating, people may use a tampon, menstrual cup, or a menstrual disc, all of which are inserted in the vagina.

53.     There is also the option to use period swimwear, though it is expensive and is considered less reliable than other products. Many period swimwear products state that they are for use on light days only and advise wearers to also use a tampon or menstrual cup if experiencing a heavy flow.

54.     Sanitary pads cannot be used for swimming because they will absorb the water in the pool and become ineffective.

**Plaintiff E.F.**

55.     E.F. is one of three children in an active-duty Army family.

56.     E.F. is 12 years old and in sixth grade. This is her first year at IRMS.

57.     E.F. started menstruating when she was ten years old.

58.     E.F. is required to swim as part of PE.

---

[9] Claire Shipman, Katty Kay and Jill Ellyn Riley, *The Confidence Gap for Girls: 5 Tips for Parents of Tween and Teen Girls*, N.Y. TIMES (Oct. 1, 2018),

59.     E.F. cannot swim when she has her period because she is not comfortable using tampons or any similar products at school and is nervous about any other alternative leaking.

60.     On October 20, 2024, Ms. Faus emailed E.F.'s physical education teacher, Mr. Dickinson, asking about the expectation for PE participation if a student is menstruating during the swim unit and cannot use a tampon.

61.     On October 21, Mr. Dickinson told Ms. Faus that "if any student is unable to swim for any reason, they do not earn credit for that day, but have the option to make it up at a later date." He said that if E.F. was "uncomfortable telling me she is unable to swim due to her cycle, you can send a note in with her. This is actually the best practice, as you will know when she is not swimming, or should be." Essentially, he was suggesting that Ms. Faus keep the school updated on E.F.'s menstrual cycle.

62.     That same day, Ms. Faus responded that, while E.F. did not have her period at that moment, she was concerned about the future. She emphasized her concern "that a school can put so much pressure on a 11 y/o child to wear a tampon." The school did not respond.

63.     In January 2025, E.F.'s PE class was scheduled for a swim unit and she had her period. On January 6, Ms. Faus emailed Defendants Decker, Green, and Caddick. She informed them that E.F. would not be participating in swim that week because she had her period, attaching her October email exchange with Mr. Dickinson.

64.     In her January 6 email, Ms. Faus again pointed out that it was completely inappropriate—and a violation of privacy—for anyone in the building to know that E.F. had her period, let alone that she was uncomfortable using a tampon at school. She

explained that this put pressure on young middle schoolers like E.F. to use a tampon when they weren't comfortable doing so.

65.    Ms. Faus also informed the administrators that E.F. could not make up the swim classes, but she would "welcome the opportunity to discuss alternative approaches to the swim curriculum that would be more equitable and inclusive for students."

66.    On January 7, Ms. Caddick responded saying that that E.F. could be medically excused for the day. She did not address the underlying issue—that there was no alternative for menstruating students who used only sanitary pads—nor did she suggest opening a dialogue to find one. She said that "at any point in time if [E.F.] is uncomfortable swimming she just needs to say she will not be swimming, she does not need to disclose any specifics for her reasoning. She can use her one free pass as well." Ms. Caddick also suggested that Ms. Faus was feeling "unheard" by the school and that Ms. Faus communicate directly with Robin Banks, the Fort Drum Education Liaison, a "resource for our military parents to help bridge communications between the school and parents and to help you advocate for your children in a constructive way."

67.    Ms. Faus responded the same day, thanking the school for granting a medical excuse and including Ms. Banks on the email. She acknowledged that while the one free pass was a "great concept," it was ineffective to address the issue because menstrual cycles last several days. She pointed out that E.F. would not be swimming on Tuesday or Thursday that week and so did "not have enough 'free passes' to cover her whole cycle."

68.    On January 7, E.F. did not swim because of her period. Instead, she sat on the side of the pool on a bench. E.F. knew that her teachers and peers knew why she was

sitting on the side, as she normally participated. It made her incredibly uncomfortable. She didn't want people looking at her, knowing why she was sitting out.

69.    Later that day, Ms. Faus checked E.F.'s online gradebook. Despite that E.F. had been theoretically provided a "medical excuse," she had still received a zero for the day. Ms. Faus provided the administrators this screenshot of E.F.'s online Gradebook:



70.    She did not receive a response.

71.    The next day, on January 8, after it was clear that the District was not willing to modify the policy, Ms. Faus filed a complaint with the Department of Education's Office for Civil Rights.

72.    On January 9, E.F. again did not swim because she had her period. She received a 0/5 for that class.

73.    This time, her online gradebook also noted that E.F. did not swim because of her period:



74.    On January 14, Ms. Faus received an automatic notification from Mr. Dickinson stating that E.F. was "required" to complete a swim make-up class if she wanted to earn back credit for the classes she had missed this semester. The email explained that the make-up session would start right after school and last until 3:15 p.m. The email requested that students be picked up after the session, as there was no bus to take them home until 4:30 p.m.

75.    E.F. did not attend the first make-up session, as it was her birthday and she had plans with her family.

76.    E.F. was not able to attend the second make-up session because her mother could not leave work early to pick her up and E.F.'s parents do not want her to ride the late bus because it also serves high school students and takes her a very long time to get home.

77.    On January 29, E.F. received her final PE grade for that marking period, which reflected a reduction due to the days she was unable to swim because of her period:



78.    E.F. and her friends have discussed the school's policy of giving students a 0/5 grade for PE when they cannot swim because of their periods. Her friends expressed a similar frustration as she has with the policy. They are also embarrassed to tell their teacher that they have their period. They purposefully use the phrase "time of the month" to avoid saying that they have their period. If they have a note, they usually give the teacher the note quickly and walk away, embarrassed. One of E.F.'s friends told her that she couldn't do the make-up class because she had sports practice, and another felt pressured to learn to use a tampon because she did not want to miss the swim class.

79.    Overall, the policy greatly upsets E.F and makes her feel inferior. She works hard to get good grades and feels that it is incredibly unfair that her grade point average is lowered because she has her period. E.F. is also distraught that the school has included her menstrual status in her Gradebook, since all of her teachers can see her grades and the associated comments. E.F. feels that she is shamed and penalized because of a normal bodily function.

**Plaintiff J.E.**

80.    J.E. is 12 years old and in the sixth grade IRMS.

81.    J.E. started her period at age 11.

82.    Like E.F., J.E. is only comfortable using pads during her cycle.

83.    This year, in the sixth grade, J.E. had her period during multiple swim units.

84.    In total, J.E. missed five days of swimming because she had her period.

85.    On December 9 and December 11, J.E. had her period and could not swim:



86.    Mr. Dickinson asked Ms. Eiss to provide a note explaining why J.E. was not swimming. Ms. Eiss chose not to provide one, as it made no difference to J.E.'s grade and she did not want to disclose her daughter's private health information to the school for no reason.

87.     Since she didn't have a note, J.E. just walked out of the locker room, unchanged, and told her teacher that she would not be swimming that day. She did not tell him that she had her period.

88.     J.E. sat on the bleachers with the few other students that could not go in the pool. She felt embarrassed that everyone knew that she had her period and wasn't swimming.

89.     J.E. was not made aware of any other activity that she could do while her classmates were swimming.

90.     Missing these classes impacted J.E's grade for the quarter:



91.    J.E. also had period on February 3, 5 and 7 and could not swim:



92.    During those days, she again sat on the side of the pool and received a grade of 0/5 for each day she missed.

93.    Ultimately, J.E. missed so many swim classes due to her period that after the swim unit, she had a failing grade for the third quarter, which could impact her GPA:



94.    J.E. was not able to attend the first make-up class for the quarter because it was scheduled for February 27, by which time J.E. had her period again.

95.    Even if J.E. were physically able to do the make-up class, it would be difficult logistically. Taking the late bus home is burdensome, as it is a very long ride, up to over an hour and a half, and it would get her home very late. Thus, realistically, if she were to do a make-up class, her parents would have to rearrange their work schedules to pick her up.

96.    Indeed, this is what happened for the second make-up on March 11. J.E.'s parents were unable to leave work early to pick her up and so she could not attend.

97.    On March 12, J.E. received the following progress report:

> **SUBJECT:  PE 6-8**
> **Current Grade Is: 64.00**
> Low grade due to swim classes not made up
> Has shown lack of effort and inconsistency

98.    J.E. has discussed the school's policy with her friends. Like her, they feel embarrassed when they have to sit on the side because they don't want anyone to know that they have their period, particularly their male peers.

99.    J.E. also experiences stress when she has to miss class, as it impacts her grade and that places increased pressure on her, particularly since she gets high grades in all of her other classes.

100.    J.E. associates having a good grade with succeeding in school and in the future. She feels scared that she might fail PE.

## CLASS ALLEGATIONS

101.    Plaintiffs reallege and incorporate by reference each and every allegation in the Complaint as though fully set forth herein.

102.    Plaintiffs sue on behalf of themselves individually and on behalf of a class of similarly situated individuals pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3).

103.    *Class Definition:* Plaintiffs seek to bring this action under Rule 23 on behalf of every IRMS student who menstruates, will menstruate or has menstruated at any time within the three (3) years prior to the filing of this Complaint and the date of final judgment in this matter.

104.    Plaintiffs reserve the right to modify this class definition and class period.

105.    Plaintiffs meet the requirements of Rule 23(a).

106.    *Numerosity*: Upon information and belief, the putative class contains over 350 current students such that joinder of all members is impracticable.

107.    *Commonality and Predominance:* Common questions of law and fact concern whether IRCSD has subjected students who menstruate to discriminatory procedures on the basis of sex in violation of Title IX, the Fourteenth Amendment, the New York State Human Rights Law, and the New York State Civil Rights Law by requiring them to either swim during menstruation or receive a zero grade for that day's class. On behalf of the putative class, Plaintiffs seek to remedy the adverse effects of this discrimination and to prevent any continued discrimination.

108.    *Typicality*: Plaintiffs' claims are typical of the claims of the putative class, as E.F. and J.E. are students at IRMS who menstruate, were required to swim as part of

their physical education class, had a swim unit while they had their period, were unable to swim at that time, and received a 0/5 as a result.

109.   *Adequacy*: Plaintiffs are members of the proposed class and will fairly and adequately represent the interests of the putative class. Plaintiffs clearly understand their obligations to the putative class, and there is no conflict between the interests of Plaintiffs and the putative class members. Additionally, Plaintiff Faus has already demonstrated her desire to advocate on behalf of the class—she previously advocated against the discrimination putative class members are facing and expressed that she wants the policy changed for all students. Plaintiffs have retained as counsel Kaufman Lieb Lebowitz and Frick LLP, who have extensive background in sex discrimination and civil rights actions, including class actions.

110.   Plaintiffs also satisfy the requirements of Rule 23(b)(2).

111.   The acts to which Defendants subjected the Plaintiffs and putative class members applied universally within the class and were not unique to Plaintiffs or any putative class member. Injunctive, declaratory, and affirmative relief are predominant forms of relief in this case, as Plaintiffs seek to change Defendants' discriminatory policy. This relief forms the basis for recovery by Plaintiffs and class members of monetary and non-monetary remedies, as well as compensatory and punitive damages.

112.   Plaintiffs also satisfy the requirements of Rule 23(b)(3).

113.   *Superiority*: Class action is superior to other available means for fairly and efficiently adjudicating the claims of Plaintiffs and putative class members. It would be impractical for all putative class members, who are subject to the same policy, to seek redress individually.

114.    *Predominance*: Common questions of law and fact concern whether IRCSD has subjected students who menstruate to discriminatory procedures on the basis of sex in violation of Title IX, the Fourteenth Amendment, the New York Human Rights Law, and the New York Civil Rights Law by giving them a zero grade when they cannot swim due to menstruation.

## CAUSES OF ACTION

### COUNT ONE
**U.S.C. § 1681 *et seq*. - Title IX of the Education Amendments of 1972, as Amended – Gender Discrimination**
**Against IRCSD and the Board**
*On Behalf of Plaintiffs and the Putative Class*

115.    Plaintiffs repeat and reallege all the preceding paragraphs.

116.    Under Title IX, no individual may be "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" on the basis of sex.

117.    Upon information and belief, at all times relevant to this action, IRCSD has received, and continues to receive, federal financial assistance.

118.    At all relevant times, Plaintiffs were students enrolled in a school controlled, operated, and overseen by IRCSD and the Board.

119.    IRCSD and the Board have subjected Plaintiffs and the putative class to discrimination on the basis of sex by subjecting them to different treatment on the basis of their sex, including by giving menstruating students a score of 0/5 on days when they could not participate in the swim unit of the education class because they were menstruating.

120.    Defendants' differential treatment of Plaintiffs and putative class members is a direct and proximate result of sex discrimination.

121.    IRCSD Officials, including Defendants Decker, Green, and Caddick, had actual notice of the discriminatory policy and practice.

122.    Because of IRCSD's unlawful conduct, Plaintiffs and putative class members have suffered and will continue to suffer harm, including but not limited to loss of future educational opportunities, humiliation, embarrassment, emotional distress, mental anguish, and other economic and non-economic damages.

123.    Plaintiffs and putative class members are entitled to compensatory damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT TWO**
**42 U.S.C. § 1983 – Fourteenth Amendment – Equal Protection Clause**
**Against Defendants IRCSD, the Board, Decker and Green, in their official**
**and individual capacities, and Caddick in her individual capacity**
*On Behalf of Plaintiffs and the Putative Class*

124.    Plaintiffs repeat and reallege all the preceding paragraphs.

125.    The above-described acts and omissions of Defendants IRCSD, the Board, Decker, Green, and Caddick violated Plaintiffs' clearly established rights under the Equal Protection Clause of the Fourteenth Amendment to the Constitution by intentionally discriminating against Plaintiffs and the putative class on the basis of their sex and treating them differently without substantial basis or important government interest.

126.    As a direct and proximate result of Defendants' violations of the Equal Protection Clause, Plaintiffs and putative class members suffered the damages hereinbefore alleged.

**COUNT THREE**
**New York State Human Rights Law, New York Executive Law § 296(4), (6) –**
**Sex Discrimination**
**Against All Defendants**
*On Behalf of Plaintiffs and the Putative Class*

127.    Plaintiffs repeat and reallege all the preceding paragraphs.

128.    IRCSD is an educational institution as defined by New York Executive Law § 292 (40). The Board oversees IRCSD.

129.    During all times relevant, Defendants Decker, Green, and Caddick were employed by IRCSD.

130.    IRCSD and the Board discriminated against Plaintiffs and the putative class by subjecting them to different treatment on the basis of their sex, including the above-described acts and omissions, depriving them of the advantages and privileges of District facilities based on sex.

131.    Defendants Decker, Green, and Caddick discriminated and/or aided, abetted, incited and/or coerced IRCSD's unlawful discrimination against Plaintiffs and the putative class by failing to remedy instances of unlawful discrimination on the basis of sex.

132.    As a direct and proximate result of Defendants' violations of the New York Human Rights Law, Plaintiffs and class members suffered and will continue to suffer harm, including but not limited to loss of educational opportunities, humiliation, embarrassment, reputational harm, emotional, physical, and psychological distress, and other damages.

**COUNT FOUR**
**New York Civil Rights Law §§ 40(c)-(d) – Sex Discrimination**
**Against Defendants Decker, Green, and Caddick in their individual**
**capacities**
*On Behalf of Plaintiffs and the Putative Class*

133.     Plaintiffs repeat and reallege all the preceding paragraphs.

134.     The acts and omissions by Defendants Decker, Green, and Caddick alleged herein subjected Plaintiffs and putative class members to discrimination in the exercise of their civil right to education under New York law because of their sex.

135.     The acts and omissions by Defendants Decker, Green, and Caddick alleged herein aided and incited unlawful discrimination against Plaintiffs and putative class members in the exercise of their civil right to education under New York law because of their sex.

136.     The violations of Plaintiffs' and putative class members' rights under the New York Civil Rights Law are the actual, direct, and proximate cause of the injuries and damages suffered by Plaintiffs and the putative class members as alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests judgment against Defendants as follows:

1.     For a preliminary and permanent injunction restraining and enjoining IRCSD, the Board, as well as Defendants Decker, Green, and Caddick, and other IRCSD or Board directors, officers, agents, affiliates, subsidiaries, servants, employees, and all other persons or entities in active concert, privity, or participation with them from issuing a menstruating student a 0/5 grade for any physical education class during which the student does not swim because they are menstruating;

2.      An award of compensatory damages to Plaintiffs and the putative class in an amount to be determined at trial;

3.      Punitive damages in an amount to be determined at trial;

4.      Attorneys' fees and costs incurred in the prosecution of this action pursuant to, inter alia, 42 U.S.C. § 1988 and other applicable laws;

5.      Pre- and post-judgment interest to the fullest extent permitted by law;

6.      Such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated:      April 11, 2025
            New York, New York

                                    KAUFMAN LIEB LEBOWITZ &
                                    FRICK LLP


                                    _____/s/_____
                                    Kyla Magun
                                    Alanna Kaufman
                                    18 East 48th Street, Suite 802
                                    New York, New York 10017
                                    (212) 660-2332