UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KRISTEN FAUS, on behalf of her minor
daughter E.F., BETSY EISS, on behalf
of her minor daughter J.E., and all
others similarly situated,

               Plaintiffs,

         -v-                  5:25-CV-453

INDIAN RIVER CENTRAL SCHOOL
DISTRICT, INDIAN RIVER CENTRAL
SCHOOL DISTRICT BOARD OF
EDUCATION, TROY DECKER, ANGELA
GREEN, and MEGHAN CADDICK,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| KAUFMAN LIEB LEBOWITZ<br>   & FRICK LLP<br>Attorneys for Plaintiffs<br>18 East 48th Street, Suite 802<br>New York, NY 10017 | ALANNA G. KAUFMAN, ESQ.<br>KYLA PERRY, ESQ.<br>SIMMONS MAGUN, ESQ. |
| FERRARA FIORENZA P.C.<br>Attorneys for Defendants<br>5010 Campuswood Drive<br>East Syracuse, NY 13057 | CHARLES E. SYMONS, ESQ.<br>RYAN L. MCCARTHY, ESQ. |

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I. INTRODUCTION

On April 11, 2025, plaintiffs Kristen Faus, on behalf of her minor daughter E.F. and Betsy Eiss, on behalf of her minor daughter J.E., (collectively, "plaintiffs") filed this putative class action against defendants the Indian River Central School District (the "IRCSD"), the Indian River Central School District Board of Education (the "Board"), Troy Decker ("Decker"), Angela Green ("Green"), And Meghan Caddick ("Caddick") (collectively, "defendants"). Dkt. No. 1. Plaintiffs' four-count complaint asserts claims for sex discrimination in violation of Title IX of the Education Amendments of 1972 ("Title IX"), the Equal Protection Clause of the Fourteenth Amendment, and related provisions of New York State law. *Id*. Plaintiffs allege that defendants discriminated against E.F., J.E., and the putative class members by refusing to provide alternative instruction and gave them a 0/5 for class when E.F., J.E., and the putative class members could not to participate in mandatory swim classes due to their menstrual cycles. *Id*.

Along with their complaint, plaintiffs moved for a preliminary injunction ("PI") pursuant to Federal Rule of Civil Procedure ("Rule") 65 that would: (1) preliminarily enjoin defendants and other IRCSD or Board directors, officers, agents, affiliates, subsidiaries, servants, employees, and all other persons or

entities in active concert, privity, or participation with them from issuing a

menstruating student a 0/5 grade for a physical education class during which

the student does not swim because they are menstruating; (2) preliminarily

enjoin defendants from retaliating against, coercing, intimidating,

threatening, or interfering with E.F., J.E., and/or the putative class member's

exercise or enjoyment of rights; and (3) Directing Defendants to preserve all

documents and communications related to this case and/or E.F. or J.E. in

their possession, custody, or control, including all electronically stored

information.  Dkt. No. 4.  Defendants have opposed.  Dkt. No. 21.  The motion

has been fully briefed and will be decided on the basis of the submissions

without oral argument.  Dkt. No. 23.

## II. __BACKGROUND__

Indian River Middle School ("IRMS") is a public middle school in the

Indian River Central School District ("IRCSD").  Compl. ¶ 10.  IRMS serves

students in sixth through eighth grade.  *Id*. ¶ 20.  The Indian River Central

School District Board of Education (the "Board") is a public education

corporation that governs the IRCSD.  *Id*. ¶ 11.  Troy Decker is the IRCSD

superintendent.  *Id*. ¶ 12.  Angela Green is the IRMS principal.  *Id*. ¶ 13.

Meghan Caddick is the IRMS assistant principal.  *Id*. ¶ 14.

E.F. states that she takes P.E. at IRMS every other day at school.  Decl. of

E.F., Dkt. No. 4-5 ¶ 4.  According to E.F., students rotate through different

P.E. units during the semester. *Id*. ¶ 5. When the unit is swimming, E.F.'s P.E. class swims in the indoor pool at IRMS for about three weeks in a row. *Id*. ¶ 6. According to E.F., "[i]f we don't participate in swimming, no matter the reason, we receive a 0/5 grade for that class. This grade goes into our online Gradebook and impacts our final PE grade and our grade point average." *Id*. ¶ 7. E.F. menstruates and does not use tampons or similar products. *Id*. ¶¶ 11–12. This means that she is unable to swim at school while she is menstruating. *Id*. ¶ 13. In January of this year, her P.E. class began a swim unit while she was menstruating. *Id*. ¶ 14. E.F. was unable to swim. *Id*. ¶ 15. Her mother emailed IRMS to let them know that she would not be swimming that week due to her menstrual cycle. *Id*.

On January 7, 2025, when E.F. had P.E., she did not change for swimming with her friends. Decl. of E.F. ¶ 16. Instead, she sat on the bleachers while her classmates swam. *Id*. E.F. felt "embarrassed and uncomfortable" that her P.E. teacher and her classmates knew why she was sitting out of class since she usually swam during swim units. *Id*. ¶ 17. She also felt frustrated that she received a zero for the day in P.E. because she would have been swimming if she was not menstruating that day. *Id*. ¶ 18. Overall, it felt as if she was being punished because she was menstruating. *Id*. E.F. had P.E. again on January 9, 2025. *Id*. ¶ 19. Again, she did not change and sat out of class because she was menstruating and was unable to swim. *Id*. This time,

- 4 -

in addition to receiving a 0/5 in her gradebook, her P.E. teacher included a note that said, "Menstrual cycle." *Id.* ¶ 21. This embarrassed E.F. because all her teachers—including her male teachers—may view her online gradebook and were thus aware that she was menstruating. *Id.* E.F. was unable to attend either of the scheduled makeup classes. *Id.* ¶ 22. E.F. received a final P.E. grade of 85% with a comment that her grade was due to "swim classes not made up." *Id.* ¶ 23. E.F. did not miss any P.E. classes other than the swim classes she missed while she was menstruating. *Id.* ¶ 24. She was upset about her grade. *Id.* She felt that her low grade meant she should feel ashamed of her menstrual cycle and as though she was being punished for menstruating during P.E. class. *Id.*

J.E. has also begun menstruating. Decl. of J.E., Dkt. No. 4-6 ¶ 5. In December of 2024, J.E.'s P.E. class was completing a swim unit while she was menstruating. *Id.* ¶¶ 8–9. On December 9, 2024, J.E. did not change to swim with her P.E. class because she was menstruating. *Id.* ¶ 9. Instead, she sat on the bleachers with several of her female classmates who were also unable to participate in P.E. due to their menstrual cycles. *Id.* ¶ 10. J.E. felt embarrassed that other students knew that she was menstruating because there was no other reason for her not to participate in P.E. class. *Id.* ¶ 11. J.E. was also unable to swim during the following P.E. class on December 11. *Id.* ¶ 12. Each of the days that J.E. was unable to participate in P.E., she

- 5 -

received a 0/5. *Id.* ¶ 13. J.E. received a lower grade overall in P.E. due to her missed swim classes. *Id.*

J.E.'s P.E. class began another swim unit in February. Decl. of J.E. ¶ 15. J.E. missed each of her swim classes on February 3, 5, and 7 because she was menstruating. *Id.* J.E. was unable to attend the makeup swim class scheduled afterschool that week for the same reasons—she was still menstruating. *Id.* ¶ 16. She was also unable to attend the following makeup class. *Id.* Because J.E. missed so many swim classes while she was menstruating, she received a failing grade in P.E. for the third quarter. *Id.* ¶ 17. Her grade included a comment that said, "low grade due to swim class not made up" and that she has "shown lack of effort and inconsistency." *Id.* J.E. was frustrated that her P.E. teacher left this comment as she states that the only reason she was not swimming with her classmates was because she was menstruating—not because she did not want to participate. *Id.* ¶ 19.

## III.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666–67 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). To obtain a preliminary injunction, the movant "must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor,

and (4) that the injunction serves the public interest." *Sam party of N.Y. v. Kosinski*, 987 F.3d 267, 273–74 (2d Cir. 2021).

A party may seek a preliminary injunction that is *prohibitory* or, one that is *mandatory*. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). Prohibitory preliminary injunctions "maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id*. This distinction, while largely semantic, is important when determining the appropriate legal standard. *See id*. at n.4 (collecting cases).

As relevant here, where plaintiffs are seeking a mandatory preliminary injunction, a heightened standard applies. *DG N.Y. CS, LLC v. Norbut Solar Farm, LLC*, 2024 WL 81308, at *3 (N.D.N.Y. Jan. 8, 2024), *reconsideration denied*, 2024 WL 476540 (N.D.N.Y. Feb. 7, 2024), *and appeal withdrawn*, 2024 WL 1550758 (2d Cir. Apr. 4, 2024) (cleaned up). Under this heightened standard, plaintiffs must "(1) make a 'strong showing' of irreparable harm, and (2) demonstrate a 'clear or substantial likelihood of success on the merits.'" *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (footnotes omitted).

## IV.  **DISCUSSION**[1]

Plaintiffs have moved for injunctive relief pursuant to Rule 65.  Pls.'

Motion for P.I., Dkt. No. 4.  Specifically, plaintiffs are seeking a preliminary

injunction that will: (1) enjoin defendants from awarding IRMS students who

are menstruating and unable to swim during a scheduled swim class a grade

of 0/5 for the class, (2) enjoin defendants from retaliating against, coercing,

intimidating, threatening, or interfering with E.F., J.E., and/or the putative

class member's exercise or enjoyment of rights; and (3) direct defendants to

preserve all documents and communications related to this case and/or E.F.

or J.E. in their possession, custody, or control, including all electronically

stored information.  *Id*.  Defendants oppose.  Defs.' Opp'n, Dkt. No. 21-4.

As an initial matter, the parties dispute whether plaintiffs are seeking a

mandatory or prohibitory PI.  Defendants argue that plaintiffs are seeking a

mandatory injunction.  Defs.' Mem. at 4–5.  Plaintiffs maintain that they are

seeking a prohibitory injunction.  Pls.' Reply, Dkt. No. 23 at 5 n.2.  Plaintiffs

argue that because the relief they are seeking would enjoin defendants from

taking "an affirmative action[,]" the injunction would be prohibitory, not

---

[1] An independent review of the submissions did not reveal any genuine disputes over the essential facts. *See, e.g., Matter of Defend H20 v. Town Bd. of Town of E. Hampton*, 147 F. Supp. 3d 80, 96–97 (E.D.N.Y. 2015) (discussing circumstances in which an evidentiary hearing on a preliminary injunction is unnecessary). Accordingly, while the few disputes over factual matters have been noted, it is not necessary to resolve them to decide the present issues.

mandatory. *Id*. Plaintiffs urge, however, that they will prevail under either standard. *Id*.

As noted *supra*, the distinction between a mandatory injunction and a prohibitory injunction is largely semantic. *See N. Am. Soccer League, LLC*, 883 F.3d at 36. Courts distinguish between the two with the adage that prohibitory injunctions "maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id*. at 36. But it is important to remember that "[i]n this context, the 'status quo' is really the 'status quo *ante*' – that is, 'the last actual, peaceable[,] uncontested status which preceded the pending controversy.'" *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (quotation omitted).

Upon review, plaintiffs are seeking a mandatory PI. Plaintiffs are seeking a preliminary injunction that would enjoin defendants from awarding IRMS students who are menstruating and unable to swim during a scheduled swim

class a grade of 0/5 for the class.[2]  The parties agree that IRMS requires students to participate in swim instruction and that non-participating students are given a 0/5 for the day (the "P.E. Plan").  Thus, plaintiffs' requested relief is mandatory in nature because it seeks to alter the status quo prior to the start of the litigation.

This means that plaintiffs must satisfy the heightened standard to obtain a PI.  *See DG N.Y. CS, LLC*, 2024 WL 81308, at *3.  Instead of a "likelihood" of success on the merits and irreparable harm, plaintiffs must demonstrate a "clear or substantial likelihood of success on the merits" and make a "strong showing of irreparable harm."  *Yang*, 960 F.3d at 128.  Having determined the applicable legal standard, the Court will proceed to analyze the preliminary injunction factors under this heightened standard.

The next matter of housekeeping for the Court is the way it must address the merits of plaintiffs' motion for a PI.  Ordinarily irreparable harm "is 'the single most important prerequisite for the issuance of a preliminary

---

[2] Plaintiffs have also included two broader, boilerplate, requests in their motion papers. Plaintiffs ask the Court to enjoin defendants from retaliating against, coercing, intimidating, threatening, or interfering with E.F., J.E., and/or the putative class member's exercise or enjoyment of rights.  Plaintiffs also ask the Court to direct defendants to preserve all documents and communications related to this case and/or E.F. or J.E. in their possession, custody, or control, including all electronically stored information.  Pls.' Motion for P.I.  These ancillary requests are unnecessary.  First, the governing law prevents defendants from retaliating against, coercing, intimidating, threatening, or interfering with plaintiffs' rights.  Injunctive relief is unnecessary absent any allegation of this kind of concrete harm.  Second, defendants are already under an ongoing duty to preserve evidence.  *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.").  Thus, plaintiffs do not require a PI to enforce this obligation either.

injunction.'" *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59 (2d Cir. 2024) (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  But a presumption of irreparable harm arises when plaintiff has both set forth and is likely to be successful on the merits of a constitutional deprivation.  *See Deide v. Day*, 676 F. Supp. 3d 196, 232 (S.D.N.Y. 2023) (collecting cases).  Where a plaintiff has alleged a constitutional injury, "'the two prongs of the preliminary injunction threshold merge into one' and 'in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.'"  *Id.* at 232 (citing *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000)).  Accordingly, the Court will first analyze whether plaintiffs have demonstrated clear or substantial likelihood of success on the merits.

**A.  <u>Success on the Merits</u>**

As discussed, to obtain a PI plaintiffs must demonstrate a "clear or substantial likelihood of success on the merits" of their claims.  *Yang*, 960 F.3d at 128.   Plaintiffs have brought four claims for sex discrimination under Title IX, the Equal Protection Clause of the Fourteenth Amendment, the New York State Human Rights Law (the "NYSHRL"), and the New York Civil Rights Law (the "NYCRL").  Compl. ¶¶ 115–36.  But to warrant preliminary injunctive relief, plaintiffs need only show a substantial likelihood of success

as to one of these claims.  *See DG N.Y. CS, LLC*, 2024 WL 81308, at *4 (citing

*L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018)).

### 1.  Plaintiffs' Title IX Claim

Plaintiffs have brought a Title IX claim for sex discrimination against

IRCSD and the Board (the "school defendants").  Compl. ¶¶ 115–23.

Title IX provides in relevant part that "[n]o person in the United States

shall, on the basis of sex, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any education program or

activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

Because Title IX was enacted to "supplement the Civil Rights Act of 1964's

bans on racial discrimination in the workplace and in universities[,]" *Doe v.*

*Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016), courts interpret the statutory

language of Title IX by using the body of caselaw developed around analogous

federal anti-discrimination laws such as Title VI and Title VII.  *Soule v.*

*Conn. Ass'n of Schs.*, 755 F. Supp. 3d 172, 184 (D. Conn. 2024).  Like Title VI

and the Equal Protection Clause, Title IX only proscribes intentional

discrimination.  *Id.* (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280

(2001)).  Disparate impact is not an available theory of liability.  *Id.*

To demonstrate intentional discrimination in violation of Title IX, the

plaintiff must show that "(1) they were excluded from, denied the benefits of,

or otherwise subjected to discrimination under the defendants' educational

programs; and (2) the defendants' actions were motivated at least in part by the plaintiffs' status as females." *Soule*, 755 F. Supp. 3d at 189 (citations omitted). As relevant here, "[d]iscrimination is defined as disparate provision of programs, aid, benefits or services or inequitable application of rules or sanctions[,]" and "includes both quid pro quo and hostile educational environment sexual harassment." *Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 150 (N.D.N.Y. 2011) (citation and internal quotation marks omitted).

Plaintiffs have advanced two theories of intentional discrimination under Title IX: (1) disparate treatment; and (2) a hostile educational environment. Plaintiffs argue that E.F. and J.E. were denied the benefits of Indian River Central School District's educational programs and suffered harassment "because of" their sex. Pls.' Mem., Dkt. No. 4 at 25.[3] Specifically, plaintiffs argue that by receiving lower grades due to defendants' discriminatory practices and being subjected to a "hostile educational environment relative to their peers," E.F. and J.E. were denied the benefits of the school defendants' programs. *Id*. Plaintiffs further argue that defendants' actions were motivated by E.F. and J.E.'s sex because they were treated differently

---

[3] Pagination corresponds to CM/ECF.

than their male peers.  The Court will address each of plaintiffs' theories in turn.

    i.  <u>Disparate Treatment</u>

First, plaintiffs have advanced a disparate treatment claim under Title IX. Pls.' Mem. at 25.

Like Title VI, Title IX claims are subject to the *McDonnell Douglas* three-step burden-shifting framework.  *Soule*, 755 F. Supp. 3d at 190 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  But application of the *McDonnell Douglas* framework is dictated by the procedural posture of the case.  *See id.* (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)).  Plaintiffs are seeking a PI.  Thus, they are not afforded the leniency that extends the pleading stage of the case.  *See Littlejohn v. N.Y.C.*, 795 F.3d 297, 307–08 (2d Cir. 2015).   Instead of reviewing the allegations in plaintiffs' complaint, the Court must weigh the parties' evidence to determine whether plaintiffs have demonstrated a clear or substantial likelihood of success on the merits of their claim.  *Supra.*  As the Second Circuit has explained, at this procedural posture the traditional three-part burden shifting framework of *McDonnell* collapses into one final inquiry: pretext.  In *Littlejohn*, the Second Circuit explained that,

> once the [defendant] presents evidence of its justification for the adverse action, joining issue on plaintiff's claim of discriminatory motivation, the

> presumption "drops out of the picture" and the
> *McDonnell Douglas* framework "is no longer relevant."
> . . . At this point, in the second phase of the case, the
> plaintiff must demonstrate that the proffered reason
> was not the true reason (or in any event not the sole
> reason) for the . . . decision, which merges with the
> plaintiff's ultimate burden of showing that the
> defendant intentionally discriminated against her.

*Littlejohn*, 795 F.3d at 307–08 (citations omitted).

Plaintiffs have demonstrated that E.F. and J.E. were denied the benefits

of IRMS's educational programs.  According to E.F. and J.E., they were each

unable to participate in their P.E. class's swim units because they were

unable to hygienically swim while they were menstruating.  Decl. of E.F. ¶¶

14–16, 19–21; Decl. of J.E. ¶¶ 9–10, 12–13.  E.F. and J.E. were not offered an

alternative means of instruction and they received a 0/5 for these missed

classes.  Decl. of E.F. ¶ 16, 19; Decl. of J.E. ¶¶ 10, 12, 15.

Defendants have proffered a reason for the school defendants' treatment of

its female students: swim safety.  Defs.' Mem. at 10–11.  Defendants urge the

Court that the school defendants' mandatory swim curriculum is gender

neutral, adheres to both the New York State Department of Health and the

Centers for disease Control's guidance on swim instruction to prevent

drowning, and is integral for the safety of its students who live near bodies of

water.  *Id*.  Now that defendants have proffered a reason for its policy,

plaintiffs carry the ultimate burden to make a clear or substantial showing

that defendants' reason is pretext of its intentional discrimination against female students.

Upon review, plaintiffs have made the requisite substantial showing that the school defendants' actions were motivated at least in part by E.F. and J.E.'s status as females. While the school defendants' policy is gender-neutral on its face, its application supports an inference of intentional discrimination. It is undisputed that students at IRMS are required to participate in swim units throughout the school year as part of their P.E. curriculum. *Supra*. There are, however, exceptions for students who are temporarily unable to participate in P.E. class. The school defendants' P.E. Plan states that:

> [s]tudents who are temporarily unable to participate in the regular program of Physical Education will remain in their scheduled physical education class. The instructor will provide an alternative, temporary, program within the guidelines established by the physician.

Ex. 1 to Decl. of Kyla Magun, Dkt. No. 4-2 at 16. Plaintiffs have demonstrated that the school defendants' made exceptions for male students who were also unable to hygienically swim. As discussed, when plaintiff Betsy Eiss's son broke his arm last year, he missed multiple swim classes due to his injury. Decl. of Betsy Eiss ¶ 14. He was not given a 0/5 for those classes, nor was he required to make-up his missed swim classes. *Id*. Instead, he was given full

credit for the classes he missed due to his injury. *Id.* This is evidence that the school defendants selectively enforce the curriculum and offer exceptions for male students.

Therefore, plaintiffs have demonstrated that defendants' proffered reason for its mandatory swim curriculum and grading policy is pretextual for sex discrimination. Accordingly, plaintiffs have demonstrated a clear or substantial likelihood of success on the merits of their Title IX disparate impact claim.

   ii. <u>Hostile Educational Environment</u>

Next, plaintiffs have advanced a hostile educational environment claim. Pls.' Mem. at 25.

Like all Title IX claims, hostile educational environment claims are analyzed using "traditional Title VI hostile environment jurisprudence." *Gartenberg v. Cooper Union for the Advancement of Science and Art*, 765 F. Supp. 3d 245, 270 (S.D.N.Y. 2025) (quoting *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011)). To demonstrate that a plaintiff was "excluded from, denied the benefits of, or otherwise subjected to discrimination under the defendants' educational programs[,]" *Soule*, 755 F. Supp. 3d at 189 (citations omitted), the plaintiff must show "he subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive, that is, that it was permeated

- 17 -

with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment." *Papelino*, 633 F.3d at 89 (citation omitted).

Upon review, plaintiffs have not demonstrated a clear or substantial likelihood of success on the merits of their hostile educational environment claim. Even if plaintiffs have demonstrated that E.F. and J.E. subjectively perceived their educational environment during P.E. class to be "hostile or abusive," plaintiffs' claim would still fail to satisfy the objective prong. *Papelino*, 633 F.3d at 89 (citation omitted). Plaintiffs have not demonstrated that E.F. and J.E.'s educational environment was "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment." *Id.* (citation omitted). A review of plaintiffs' sworn declarations reveals that E.F. and J.E. felt embarrassed when they sat out of P.E. when they were menstruating. Decl. of E.F. ¶ 17; Decl. of J.E. ¶¶ 11, 13–14. But plaintiffs have not submitted evidence that E.F. or J.E. were subject to an objectively *hostile or abusive* educational environment.

According to E.F., she felt embarrassed when she sat out of her P.E.'s swim unit in January because she believed "the other students in [her] class knew why [she] was sitting out, since [she] usually swim[s]." Decl. of E.F. ¶ 17. She also felt embarrassed when she received a 0/5 in her gradebook with

a note that said "Menstrual cycle[]"because all of her teachers have access to her online gradebook and were thus, aware of her menstrual cycle. *Id.* ¶ 21. E.F. later felt ashamed when her low P.E. grade was a direct reflection of missed classes due to her menstrual cycle. *Id.* ¶ 24.

According to J.E., she too experienced embarrassment when she sat out of swim class. In December 2024, J.E. was menstruating when her P.E. class began a swim unit. Decl. of J.E. ¶¶ 8–9. She was unable to participate and sat out on the bleachers. *Id.* ¶ 10. She felt "embarrassed to sit by the side of the pool because everyone in the class knew [she] had [her] period and wasn't swimming." *Id.* ¶ 11. She later felt frustrated when she received a 0/5 for missing two days of swim class because she felt she was being punished for menstruating. *Id.* ¶¶ 13–14.

While plaintiffs have demonstrated that E.F. and J.E. undoubtedly experienced embarrassment and stress while sitting out of their P.E. class's swim instruction, they have not demonstrated that E.F. or J.E. were subject to any discriminatory intimidation, harassment, or ridicule at school. Therefore, plaintiffs have not demonstrated a clear or substantial likelihood of success on the merits of their hostile educational environment claim.

### 2. **Plaintiffs' Equal Protection Clause Claim**

Plaintiffs have also brought a 42 U.S.C. § 1983 claim against the IRCSD, the Board, Decker in his official and individual capacities, Green in her

official and individual capacities, and Caddick in her individual capacities for violations of the Equal Protection Clause. Compl. ¶¶ 124–26. Plaintiffs argue that the IRCSD and the Board, together with administrators Decker, Green, and Caddick violated E.F., J.E., and the putative class members' equal protection rights when they enforced of the P.E. Plan in a discriminatory fashion. Pls.' Mem. at 23. Plaintiffs further argue that the P.E. Plan should be subjected to heightened scrutiny. *Id*. at 22.

"The Equal Protection Clause of the Fourteenth Amendment, made actionable by 42 U.S.C. § 1983,[4] "guarantees the right to be free from 'invidious discrimination in statutory classifications and other governmental activity.'" *Barkai v. Mendez*, 629 F. Supp. 3d 166, 189 (S.D.N.Y. 2022) (quoting *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996)). In other words, the government must "treat all similarly situated people alike." *Id*. (quoting *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)).

To establish an Equal Protection Clause violation, the plaintiff "must allege that a government actor intentionally discriminated against [him or her] on the basis of race, national origin or gender." *Barkai*, 629 F. Supp. 3d

---

[4] Section 1983 is just an enforcement mechanism that plaintiffs may use "to vindicate rights conferred only by a statute that contains its own structure for private enforcement[.]" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("[§ 1983] merely provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.,* rights independently 'secured by the Constitution and laws' of the United States.").

at 189 (quotation omitted). Plaintiff may do so by pointing to a government law or policy that expressly classifies individuals based on a protected characteristic such as race or gender. *See id.* (citations omitted). Plaintiff may also demonstrate an Equal Protection Clause violation even where the government law or policy is facially neutral but nonetheless is (1) "applied in a discriminatory fashion[;]" or (2) "was motivated by discriminatory animus and its application results in a discriminatory effect." *Id.* (quotation omitted). But under any of these three theories, the plaintiff "must prove purposeful discrimination directed at an identifiable or suspect class." *Kuiken v. Cnty. of Hamilton*, 669 F. Supp. 3d 119, 126 (N.D.N.Y. 2023) (quoting *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)). As relevant here, where the government law or policy classifies on the basis of gender, the "classification[] must bear a close and substantial relationship to important governmental objectives[.]" *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 273 (1979) (citation omitted).

   i. Individual Capacity Claims

   Plaintiffs have brought § 1983 Equal Protection Clause claims against Decker, Green, and Caddick in their *individual capacities*. Compl. ¶¶ 124–26.

   Section 1983 "holds an individual personally responsible for the role his or her own acts or omissions played in violating someone's constitutional

rights[.]" *Kuiken v. Cnty. of Hamilton*, 669 F. Supp. 3d 119, 128 (N.D.N.Y. 2023) (citations omitted). That is, the plaintiff "must establish (1) that some person has deprived him of a federal right, and (2) that the person who has deprived him of that right acted under color of state . . . law." *Doe v. Patrick*, 437 F. Supp. 3d 160, 170 (N.D.N.Y. 2020) (citation and internal quotation marks omitted).

The individual defendants are all administrators employed by the IRCSD. *Supra.* So state action is not at issue. The central inquiry, therefore, is whether the individual defendants were personally involved in the alleged constitutional deprivations. *See Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)) ("To 'establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation.'").

Plaintiffs can demonstrate personal involvement by showing that: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the

defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." *Littlejohn*, 795 F.3d at 314 (quotation omitted).

"In the school setting, a violation of the Equal Protection Clause can arise from direct action or due to deliberate indifference." *D.J. by Comfort v.* 722 F. Supp. 3d 148, 163 (W.D.N.Y. 2024) (citation omitted).  But "[d]eliberate indifference is not demonstrated on every occasion that a plaintiff has reported potential rights violations to a policymaker: rather, constitutionally cognizable deliberate indifference is a 'stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Arnold v. Town of Camillus*, 662 F. Supp. 3d 245, 257–58 (N.D.N.Y. 2023) (quoting *O'Kane v. Plainedge Union Free Sch. Dist.*, 827 F. App'x 141, 143 (2d Cir. 2020)).

In support of their motion for a preliminary injunction, plaintiffs argue that the individual defendants "knew that the school was discriminating yet continued to implement the policy, depriving [plaintiffs] of their federal rights."  Pls.' Mem. at 24 n.8.

As with plaintiffs' municipal liability claims, the first step in analyzing an Equal Protection Clause claim is determining whether the plaintiff have "proffered a sufficient comparator."  *Thomas v. Genova*, 698 F. Supp. 3d 493, 512 (E.D.N.Y. 2023), *aff'd as amended*, No. 23-7452, 2025 WL 583182 (2d Cir.

Feb. 24, 2025) (citation omitted).  The plaintiff's comparator does not need to be "identical[,]" but must be "similarly situated in all material respects" to the plaintiff.  *Id*. (citation omitted).  Once plaintiffs have made that showing, the second step is to determine whether plaintiffs have proven that "the disparate treatment was *caused* by the impermissible motivation." *Thomas*, 698 F. Supp. 3d at 513 (emphasis in original) (quoting *Anderson v. City of New York*, 817 F. Supp. 2d 77, 94–95 (E.D.N.Y. 2011).

Upon review, plaintiffs have demonstrated a clear or substantial likelihood of success on the merits of their individual capacity § 1983 claims. At the first step of the analysis, plaintiffs have submitted evidence of a sufficient comparator who was treated differently than E.F., J.E., and the putative class members: a fellow IRMS student who was also temporarily unable to hygienically swim.  As discussed above, Betsey Eiss's son attended eighth grade in the IRCSD.  Decl. of Betsy Eiss ¶ 14.  During eighth grade, Eiss's son broke his arm and was unable to participate in his P.E. class's swim classes.  *Id*.  He missed approximately four classes.  *Id*.  He was not, however, given a 0/5 for those classes or required to makeup his missed swim classes.  *Id*.

Plaintiffs have also shown that Decker, Green, and Caddick were personally involved in depriving E.F., J.E., and the putative class members of their equal protection rights.  *Infra*.  Plaintiffs have established Decker,

- 24 -

Green, and Caddick's personal involvement under a theory of deliberate indifference.

Here, plaintiffs' evidence demonstrates that Decker, Green, and Caddick each were informed of, and failed to curtail, the school's grading policy for its mandatory swim curriculum.  Ex. 2 to Decl. of Kristen Faus at 15–16.

On January 6, 2024, Kristen Faus contacted Decker, Green, and Caddick to inform them that E.F. would be missing her mandatory swim classes on account of her menstrual cycle and the fact that she was unable to comfortably wear menstrual products that would allow her to hygienically swim.  Decl. of Kristen Faus ¶¶ 16–17.  When Caddick suggested that E.F. could use her "free pass" to account for one of her missed swim classes, Faus informed her that crediting a single class period was insufficient given the average length of a woman's menstrual cycle.  *Id.* ¶ 20; Ex. 2 to Decl. of Kristen Faus at 15–16.  In fact, E.F. still received a 0/5 for missing swim class despite Faus alerting the school to the fact that she was missing class due to her menstrual cycle.  *Id.* at 12.  Faus goes on to question the legality of giving female IRMS students a 0/5 when they are unable to swim due to their menstrual cycle and asks for the opportunity to suggest changes to the swim curriculum to make it "more equitable and inclusive for all students."  *Id.* at 15.

This kind of selective enforcement would fail to satisfy even *rational basis scrutiny*. *See Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018) (quotation omitted) ("[R]ational basis review 'imposes a requirement of some rationality in the nature of the class singled out.'").  It follows that selectively enforcing the P.E. Plan would also fail to satisfy the "close and substantial relationship" the enforcement must have to an "important governmental objective[]." *Pers. Adm'r of Massachusetts*, 442 U.S. at 273 (citation omitted).

Therefore, plaintiffs have submitted sufficient evidence to support their arguments that defendants were aware that E.F., J.E., and the putative class members' equal protection rights were being infringed upon yet took no action.  Accordingly, plaintiffs have demonstrated a substantial or clear likelihood of success on their individual capacity claims against Decker, Green, and Caddick.

ii.  <u>Official Capacity Claims</u>

Next, plaintiffs have brought their Equal Protection Clause claims against Decker and Green in their official capacities. *Supra*.

The Eleventh Amendment provides that: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. am. XI.  The Eleventh Amendment bars civil suits "for damages brought

against an entity that is fairly considered to be an 'arm of the state.'" *T.W. v. N.Y. State Bd. of L. Examiners*, 110 F.4th 71, 80 (2d Cir. 2024), *cert. denied sub nom. T. W. v. NY Bd. of L. Examiners*, 2025 WL 1426672 (U.S. May 19, 2025) (quoting *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir. 1996)).  An exception to this general rule  applies where the relief sought is not monetary damages, but prospective injunctive relief.  Under *Ex parte Young*, 209 U.S. 123 (1908), plaintiffs may bring "suits against state officials that "seek[ ] only prospective injunctive relief *in order to* 'end a continuing violation of federal law.'" *T.W.*, 110 F.4th at 93 (2d Cir. 2024) (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996)).

As discussed, plaintiffs are seeking prospective injunctive relief that would enjoin defendants from continuing to enforce its mandatory swim curriculum and grading policy.  Therefore, the Eleventh Amendment does not prohibit plaintiffs' official capacity claims against Decker and Green.  However, these official capacity claims should still be dismissed.  *Infra.*

A § 1983 "claim against a government official in his official capacity is merely another way of asserting a claim against the governmental entity that employs the official."  *Beckwith v. Erie Cnty. Water Auth.*, 413 F. Supp. 2d 214, 224–25 (W.D.N.Y. 2006) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)); *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 361 (W.D.N.Y. 2021) (quotation omitted) ("Section 1983 claims against municipal employees

sued in their official capacity are treated as claims against the municipality itself.").

Whereas here, plaintiffs have named both the municipal entities—the IRCSD and the Board—the official capacity claims brought against the individual defendants should be dismissed as redundant. *See id.* Further, plaintiffs have not yet established that Decker and Green are "final policy makers" in lieu of the IRCSD and/or the Board. *See T.J. on behalf of B.W. v. Bd. of Educ. of Mt. Vernon City Sch. Dist.*, 2019 WL 13170168, at *11 (S.D.N.Y. Sept. 30, 2019) (citing *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 372–73 (S.D.N.Y. 2014)) (concluding that under New York law, superintendents do not inherently possess authority to create his or her own policies; the board of education retains that authority").

iii. *Monell* Claims

Plaintiffs' § 1983 claims against the IRCSD and the Board of Education, plaintiffs are appropriately analyzed as claims for municipal liability under *Monell*, 436 U.S. 658 (1978). *See Ortiz*, 523 F. Supp. 3d at 361 ("[I]n order to assert a viable claim against a municipal employee in his official capacity, the plaintiff must have a viable *Monell* claim against the municipality.").

To demonstrate a clear or substantial likelihood of success on the merits of their *Monell* claims against the IRCSD and the Board of Education, plaintiffs must show that "(1) a municipal policy or custom that (2) causes the plaintiff

to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020) (citing *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)). As relevant here, "[a] school district's liability under *Monell* may be based on any of the following three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.'" *Hurtle v. Board of Educ. of City of N.Y.*, 113 F. App'x 432, 424–25 (2d Cir. 2004) (quotation omitted).

Plaintiffs argue that Decker and Green were official policy makers for the IRCSD and the Board. Pls.' Mem. at 24 n.8. However, as discussed *supra*, plaintiffs have not established that either the IRCSD or the Board delegated to Decker or Green the authority to "make policy." Therefore, plaintiffs' municipal liability claims will proceed against the IRCSD and the Board. However, plaintiffs' municipal liability claims are not foreclosed. Plaintiffs have also pursued a theory of deliberate indifference. Pls.' Mem. at 23.

Municipal liability may attach where a school district or board of education has failed to properly train, hire, and/or supervise its employees. *See T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 376 (S.D.N.Y. 2014) (quoting *Bliss v. Putnam Valley Cent. Sch. Dist.,* 2011 WL 1079944, at *8 (S.D.N.Y. Mar. 24, 2011)) ("A school district may be held liable for

inadequate training, supervision[,] or hiring where the failure to train, hire

[,] or supervise amounts to deliberate indifference to the rights of those with

whom municipal employees will come into contact.").  But as the Second

Circuit has explained, "'isolated acts by non-policymaking municipal

employees are generally not sufficient to demonstrate a municipal custom,

policy, or usage that would justify liability,' [instead, the practice must be]

sufficiently widespread and persistent to support a finding that they

constituted a custom, policy, or usage of which supervisors must have been

aware." *Hu v. City of New York*, 927 F.3d 81, 106 (2d Cir. 2019).  To be

successful, plaintiffs must "show that 'the alleged practice [was] so manifest

as to imply the constructive acquiescence of senior policymaking officials.'"

*Id*. (quotation omitted).

Upon review, the Court is satisfied with plaintiffs' evidentiary showing

that the IRCSD and the Board had constructive knowledge of its employees

practice of selectively enforcing the P.E. Plan.  Plaintiffs' declarations and

accompanying exhibits contain excerpts of email correspondence between

Kristen Faus and Decker, Green, and Caddick.  Ex. 2 to Decl. of Kristen Faus

at 12–15.  Plaintiffs have also included email correspondence between

Kristen Faus and IRMS P.E. teacher, Matthew Dickinson ("Dickinson").  *Id*.

at 16.  In one email in particular, Dickenson informs Faus that under the

P.E. Plan, students who are unable to swim for any reason are not given

credit for that class.  *Id.*  However, as discussed, plaintiffs have also submitted declarations and P.E. class records that show that Betsy Eiss's son was not denied class credit when he was unable to swim due to a broken arm. Decl. of Betsy Eiss ¶ 14.

As discussed, this kind of selective enforcement would fail even rational basis scrutiny.  *See Winston*, 887 F.3d 553, 560 (2d Cir. 2018).  Defendants' proffered purpose of the necessity for water safety cannot be rationally related to a policy that is enforced against some but not all of its students. *Id.*  Nor does that purpose bear "a close and substantial relationship to [an] important governmental objective[.]"  *Pers. Adm'r of Massachusetts*, 442 U.S. at 273 (citation omitted).

Thus, the practice is so common that the IRCSD and Board have constructive knowledge of the unconstitutional actions of its employees. Accordingly, plaintiffs have made a clear or substantial showing of success on the merits of their *Monell* claims against the IRCSD and the Board for violations of the Equal Protection Clause.

### 3.  Plaintiffs' State Law Claims[5]

Plaintiffs have also brought claims pursuant to the NYSHRL and NYCRL against all defendants.  Compl. ¶¶ 127–36.  Plaintiffs bring these claims

---

[5]  It is undisputed that plaintiffs provided defendants with a notice of claim as required by N.Y. Educ. Law § 3813.  Pls.' Mem. at 17 n.5.

under both a disparate treatment and disparate impact theory of liability.
*Id.*

   i. <u>Disparate Treatment</u>

Plaintiffs have brought claims for disparate treatment under the NYSHRL
and the NYCRL.  Compl. ¶¶ 127–36.  Plaintiffs assert their claims for
disparate treatment under the NYSHRL against all defendants.[6]  *Id.* ¶¶ 127–
32.  Plaintiffs assert their NYCRL claim against Decker, Green, and Caddick
in their individual capacities.  *Id.* ¶¶ 133–36.

Upon review, plaintiffs have demonstrated success on the merits of both
their NYSHRL and NYCRL disparate impact claims.  To start, plaintiffs'
disparate treatment claims brought under the NYSHRL against the IRCSD
and the Board are analyzed using the same *McDonnell Douglas* burden
shifting framework that applies to Title IX claims.  *See Soule*, 755 F. Supp. 3d
at 184 (explaining that "courts have interpreted Title IX by looking to the
body of case law developed under Title VI, as well as the case law
interpreting Title VII[]"); *see also Jacobs v. Hudson Valley Family Phys.,
PLLC.*, 725 F. Supp. 3d 235, 245–46 (N.D.N.Y. 2024) (analyzing Title VII
claim and NYSHRL claim together).  Accordingly, for the same reasons
plaintiffs have demonstrated a clear or substantial likelihood of success on

---

[6]  Plaintiffs' NYSHRL claims against Decker, Green, and Caddick are brought under an aiding
and abetting theory pursuant to N.Y. Exec. Law § 296(6).

the merits of their Title IX claim for disparate treatment, *supra*, plaintiffs have also made the requisite showing for their NYSHRL disparate treatment claim.

Plaintiffs have also made the requisite showing for their aiding and abetting claim against Decker, Green, and Caddick. *See Bautista v. PR Gramercy Square Condo.*, 642 F. Supp. 3d 411, 428 (S.D.N.Y. 2022) ("To state a claim for aiding and abetting discrimination, a plaintiff must show that the defendant "actually participate[d]" in the unlawful conduct and that the aider and abettor "share the intent or purpose of the princip[al] actor."). Plaintiffs have demonstrated that each individual defendant was personally involved in the discriminatory application of the P.E. Plan. *Supra.*

The same would ordinarily be true for plaintiffs' NYCRL disparate treatment claims against Decker, Green, and Caddick in their individual capacities. Both state and federal courts have interpreted the NYCRL "should be more liberally construed" than the similar anti-discrimination provisions found in Title IX. *Doe v. Yeshiva Univ.*, 703 F. Supp. 3d 473, 505 (S.D.N.Y. 2023) (collecting cases). However, unlike plaintiffs' Title IX claims against the IRCSD and the Board, plaintiffs' NYCRL claims are only brought against the individual defendants in their individual capacities.

  ii. <u>Disparate Impact</u>

Upon review of the available record, plaintiffs have not made a clear or substantial likelihood of success on the merits of their disparate impact claims. Plaintiffs have not submitted any statistical evidence from which the Court can analyze their disparate impact claims. While it is conceivable that enforcing the P.E. Plan will disproportionality impact female students because they are more likely to miss class due to their monthly menstrual cycle, mere speculation is insufficient. *See LaBarbera v. NYU Winthrop Hosp.*, 527 F. Supp. 3d 275, 302 (E.D.N.Y. 2021) (quotation omitted) ("Although the Second Circuit did not 'identify the precise quantum of proof that would have been sufficient to sustain [plaintiff's] evidentiary burden,' it stands to reason that some quantum of proof is needed."). Accordingly, plaintiffs have not made a clear or substantial likelihood of success on the merits of their disparate impact claims.

## B. **Irreparable Harm**

As discussed *supra*, where a "plaintiff alleges [and convincingly shows] a deprivation of a constitutional right, the Court presumes the existence of irreparable harm." *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 276 (S.D.N.Y.), *aff'd,* 788 F. App'x 85 (2d Cir. 2019); *Andre-Rodney v. Hochul*, 569 F. Supp. 3d 128, 141–42 (N.D.N.Y. 2021) (quotation omitted) ("[I]f "the constitutional deprivation is convincingly shown and that violation carries non[-]compensable damages, a finding of

irreparable harm is warranted.").

Plaintiffs have demonstrated a clear or substantial likelihood of success on the merits of their Equal Protection Clause claims against all defendants. *Supra*. Therefore, the Court presumes the existence of irreparable harm and proceeds to analyze the remaining preliminary injunction factors.

### C. **Balance of the Equities**

As a final matter, "[p]laintiffs must demonstrate 'that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 65 (N.D.N.Y. 2024) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "In assessing the balance of equities, 'the court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Gallagher v. N.Y. State Bd. of Elections*, 477 F. Supp. 3d 19, 49 (S.D.N.Y. 2020) (quoting *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019)). But "[w]here the [g]overnment is the opposing party, the final two factors in the [preliminary injunction] analysis—the balance of the equities and the public interest— merge." *A.H. by & through Hester v. French*, 511 F. Supp. 3d 482, 501 (D. Vt. 2021) (quotation omitted).

Upon review, and in considering the public interest, granting injunctive relief serves the public interest.  Absent a preliminary injunction plaintiffs and the putative class members will continue to be denied their (1) constitutionally protected right to equal protection; (2) federally protected right to equal educational opportunities; and (3) state law rights to be free from gender discrimination.  Securing plaintiffs' rights to be treated equally regardless of their gender serves the public interest.  A preliminary injunction enjoining defendants from selectively enforcing its P.E. Plan against its menstruating, female students therefore serves the public interest.

## V.  CONCLUSION

For the reasons discussed above, plaintiffs' motion for a preliminary injunction will be granted.  Plaintiffs have demonstrated a clear or substantial likelihood of success on the merits of their Title IX disparate treatment claim, their Equal Protection claims, and their NYSHRL and NYCRL disparate treatment claims.  For this reason plaintiffs have also demonstrated a presumption of irreparable harm flowing from defendants' equal protection violations.  Finally, an analysis of the public's interest in granting plaintiffs a preliminary injunction reveals that relief serves the public interest.  Plaintiffs have demonstrated that defendants' P.E. Plan violates their federal and state rights to attend public school free from gender

discrimination.  While the Court is sympathetic to defendants' interest in teaching its students about water safety, certainly that goal can be accomplished without discriminating against its female students.

Therefore, it is

ORDERED that

1.  Plaintiffs' motion for a preliminary injunction is GRANTED;

2.  During the pendency of this litigation and until a trial on the merits, unless otherwise ordered by the court, defendants are hereby ENJOINED from issuing a menstruating student a 0/5 grade for a physical education class during which the student does not swim because they are menstruating;[7] and

3.  The Court determines that <u>no security</u> is necessary under Rule 65(c) as the injunction is unlikely to cause the defendants to suffer costs and damages if they are wrongly enjoined.

The Clerk of the Court is directed to terminate the pending motion.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  August 29, 2025

---

[7]  This injunction binds defendants as well as their officers, agents, servants, employees, and attorneys.

Utica, New York